**Supreme Court**

No. 2012-263-C.A.

(P1/10-1155A)

State                              :

       v.                               :

Michael Patino.                     :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                                        :

v.                                         :

Michael Patino.                      :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.** On April 2, 2010, Michael Patino (defendant) was indicted for the first-degree murder of Marco Nieves, the six-year-old son of his girlfriend, Trisha Oliver. The state's case against the defendant was constructed largely on the basis of incriminating text messages purportedly sent by the defendant to Ms. Oliver, messages which were discovered on her cell phone by officers of the Cranston Police Department. The defendant filed a number of pretrial motions seeking to suppress the bulk of the evidence that the state intended to use against him. After a month-long series of evidentiary hearings, the hearing justice rendered a comprehensive and thoughtful one-hundred-ninety page written decision. Holding that the defendant had a reasonable expectation of privacy in his text messages, she granted all but one of the motions to suppress. In addition, she found that the defendant had made a preliminary showing that "numerous sworn statements made by police officers in a dozen warrant affidavits were either deliberately false or made in reckless disregard of the truth," thereby entitling the defendant to a Franks[1] hearing.

---

[1] Franks v. Delaware, 438 U.S. 154, 155-56 (1978).

The attorney general, pursuant to G.L. 1956 § 9-24-32,[2] appealed from the Superior Court order, arguing that: (1) defendant lacks standing to contest the lawfulness of the search of Trisha Oliver's cell phone; (2) defendant does not have an objectively reasonable expectation of privacy in sent text messages; (3) defendant has no standing to make a Franks challenge; and (4) even with the removal of the materials identified by the hearing justice, the relevant affidavits were sufficient to establish probable cause. For the reasons set forth in this opinion, we affirm in part and vacate in part the order of the Superior Court.

# I

## Facts and Travel

## A

## Initial Investigation

On October 4, 2009, at approximately 6:08 a.m., Trisha Oliver placed a 9-1-1 call from her Cranston apartment indicating that her six-year-old son was unresponsive and not breathing. At approximately 6:15 a.m., Cranston Rescue and Fire Department responded to the apartment and, within minutes, transported Marco to Hasbro Children's Hospital in Providence. The rescue personnel arrived at the hospital with Marco shortly after 6:30 a.m.

Meanwhile, members of the Cranston Police Department arrived at the apartment to begin an investigation. Sergeant Matthew Kite arrived at the apartment at approximately 6:20 a.m. and spoke briefly with Officer Aldrich, who was leaving the scene to escort the ambulance

---

[2] General Laws 1956 § 9-24-32 provides, in pertinent part:

> "In a criminal proceeding, the attorney general shall have the right to object to any finding, ruling, decision, order, or judgment of the superior court or family court, and the attorney general may appeal the findings, rulings, decisions, orders, or judgments to the supreme court at any time before the defendant has been placed in jeopardy * * * ."

to the hospital. Sergeant Kite then met outside the apartment with Officers Carroll and Lee, as well as Trisha Oliver. Oliver then escorted Sgt. Kite into her apartment so she could show him Marco's bedroom and other areas of the apartment that he deemed relevant to the investigation of Marco's condition.

Once in the apartment, Sgt. Kite observed Oliver's boyfriend, defendant Michael Patino, sitting on the couch with the couple's fourteen-month-old daughter, Jazlyn. Ms. Oliver proceeded to show Sgt. Kite around the apartment to survey the remnants of Marco's illness. They first passed through the dining room and living room to Marco's bedroom, where Sgt. Kite observed a stripped bed and linens on the floor. They continued on to the master bedroom and viewed another stripped bed, as well as a trash can that Marco had used as a vomit receptacle. Finally, she showed him the bathroom, where Sgt. Kite observed dark brown vomit in the toilet, which he described as having the appearance of "coffee ground[s]." They then returned to the entrance of the apartment; Officer Carroll transported Oliver to the hospital shortly thereafter.

Although Sgt. Kite testified that he did not at that point consider the apartment to be a crime scene, he nevertheless requested that Officer Lee start a crime scene roster to document who entered and exited the apartment. After Oliver had been transported to the hospital, Sgt. Kite remained at the apartment to look for potentially hazardous materials that could have caused Marco's illness. It was at this point that Sgt. Kite observed four different cellular telephones, the contents of which would largely form the basis of the state's case against defendant and the issues on appeal before this Court. Sergeant Kite observed an LG Verizon cell phone (LG phone) on the kitchen counter; a Metro PCS Kyocera cell phone (Metro PCS phone) on the dining room table; a T-Mobile Sidekick cell phone (T-Mobile phone) on the headrest of the couch behind defendant; and an iPhone (iPhone) on the armrest of the couch.

Sergeant Kite then spoke with defendant, who agreed to accompany Sgt. Kite to the Cranston police headquarters to make a statement about what had transpired that morning. At the suppression hearing, Sgt. Kite testified that he asked defendant what had happened the previous night, but defendant indicated that he had not been there the previous night and did not know. Sergeant Kite also testified that he inquired of defendant the time at which Oliver had called him to come over, to which defendant responded that she had not called him because he does not own a cell phone, and that he had arrived at the apartment early that morning, by chance.

Sergeant Kite testified that, shortly after this interaction with defendant, he noticed that the LG cell phone on the kitchen counter "indicated audibly and by light that it was receiving a message." In response, Sgt. Kite went over to the phone and picked it up, checking to see if it was Marco's father or someone else calling regarding Marco's condition. Sergeant Kite testified that he picked up the phone and viewed an alert on the front screen of the phone indicating that there was one new message, at which point he opened the phone to view the interior screen. The interior screen indicated that there was a new message, but that the message could not be received due to a lack of credit on the phone account. In an effort to acknowledge receipt of the message and thereby avoid repeat notifications, Sgt. Kite testified that he "manipulated the button" on the phone, which led to a mailbox listing incoming and outgoing text messages. Sergeant Kite testified that, upon seeing the word "hospital" in a text message, he clicked the phone to view the following message in the "outbox" folder:[3] "wat if I got2 take him 2 da [hospital] wat will I say and dos marks on his neck omg." The message was addressed to

---

[3] Critically, although this message was stored in the "outbox" folder, the phone indicated that the message was "saved" in the "outbox" and, due to a lack of funds on Oliver's phone, was never actually delivered.

"DAMASTER" at phone number (401) xxx-xx80; a subsequent investigation revealed that "DAMASTER," the intended recipient of the text message was, in fact, defendant.

Sergeant Kite testified that, although he found the message suspicious, he did not scroll through the phone any further, but instead placed the phone back on the counter and proceeded to call Lt. Sacoccia at headquarters to inform him of the curious text message. Sergeant Kite also informed Lt. Sacoccia that there would not be anyone to take care of Jazlyn while defendant was being interviewed, at which point Lt. Sacoccia consulted with the Department of Children, Youth, and Families (DCYF) and had an ambulance dispatched to pick up Jazlyn and transport her to the hospital "as a precaution." The ambulance arrived and left with Jazlyn shortly thereafter.

At approximately 7:25 a.m., Officer Jeremy Machado escorted defendant to Cranston police headquarters, where they were met by Officer Ryan Shore. Officers Shore and Machado brought defendant to a conference room and directed him to empty his belongings onto a table. Among the belongings was the T-Mobile phone, which was confiscated immediately by Officer Machado. Shortly thereafter, Officer Machado escorted defendant upstairs to the detective division.

After defendant left the apartment, Sgt. Kite, who had remained on scene, noticed that the T-Mobile phone that had been on the headrest behind defendant was no longer there. Sergeant Kite testified that he immediately called headquarters about the missing phone and suggested that, "[t]here is possibly some information that needs to be protected on it and I just advised [Lt. Sacoccia] that you may want to take it off him when [Machado and defendant] arrived at headquarters." Sergeant Kite then remained at the apartment until 10:15 a.m., during which time

Det. Wayne Cushman and Det. Peter Souza from the Bureau of Criminal Investigation (BCI) arrived.

There is considerable discrepancy about what occurred during the time that the officers remained at the apartment. The hearing justice found that the detectives received a call from Lt. Sacoccia informing them that a search warrant had been signed, at which time they began to photograph and videotape the scene, as well as gather and bag items for evidence. Sergeant Kite and Sgt. Cushman testified, however, that the detectives did not begin to photograph and bag evidence until after Sgt. Edward Walsh arrived with a hard copy of a signed search warrant.[4] In any event, among the items bagged for evidence was the LG phone, the contents of which had been previously photographed by Det. Cushman. Instead of securely sealing the phone, the BCI detectives placed it in a brown paper bag, which Sgt. Kite brought with him when he left the apartment. The bag with the phone was eventually returned to Det. Cushman at headquarters later that afternoon.

Photographs of the contents of the LG phone, which was later determined to be Oliver's phone, reveal text messages that include not only vulgar and profane language, but also information inculpating defendant with respect to Marco's injuries.[5]

---

[4] On cross-examination, after being impeached with his prior bail hearing testimony, Det. Cushman admitted that, prior to Sgt. Walsh arriving with the warrant he began photographing the text messages after being instructed over the phone by Sgt. Walsh to do so.

[5] For example, on October 3, 2009, the following exchange of texts sent between Oliver's LG phone and defendant's T-Mobile phone occurred between approximately 4:48 p.m. and 5:57 p.m.:

> "Sent: of course he is gonna be all hurt and cryin cuz u fuckin beat the crap out of him im not wit that shit.
> "Read: I PUNCH DAT LIL BITCH 3 TIMES AND DAT WAS IT. DA HARDEST 1 WAS ON HIS STOMACH CUZ HE MOVED. BUT LET HIM BE A MAN AND NOT A LIL BITCH LIKE U.
> "Read: WAT KIND OF DISCIPLINE OR ANYTHIN U GONNA KNO.

The evidence adduced at hearing with respect to the collection and documentation of the various cell phones not only is unclear, but evinces an apparent disregard by the Cranston Police Department for the chain of custody and preservation of what was ultimately extremely probative evidence in the state's case against defendant.[6] For instance, Officer Machado testified that he confiscated defendant's T-Mobile cell phone, and, instead of securing the phone into evidence at the police station, he secured the phone on his person. Officer Machado subsequently gave defendant's confiscated cell phone to Sgt. Walsh, who attempted to turn the phone on and, when unsuccessful, proceeded to place it in his pocket. The phone was then transferred from Sgt. Walsh to Det. Souza, and then to Det. Cushman before it was eventually logged into evidence at the police station later that day. Furthermore, according to the extraction

---

> "Sent: wateva u always think u didnt hit hard but u do u hurt me could imagine wat u did 2 him 4 ur info he isn't complaining just him throwin up and in pain is enough
> "Sent: idk wat u did but u hurt is stomach real bad
> "* * *
> "Sent: wtf did u do 2 my son mike
> "Read: I TOLD U. I WENT 2 PUNCH HIM ON HIS BACK AGAIN AND HE MOVED AND I HIT HIM ON HIS STOMACH.
> "* * *
> "Sent: mike he is in madd pain u had 2 hit him real hard mike wtf
> "Read: I HIT HIM DA SAME WAY EVERYWHERE BUT ITS DAT HE MOVED AND I HIT HIM BAD."

[6] The hearing justice remarked that "[p]rior to and throughout this hearing, there were blatant inconsistencies in the evidence about which cell phones were seized from the apartment." For instance, she cited to Sgt. Kite's testimony that the cell phone missing from the apartment after defendant's departure was the Metro PCS phone (as opposed to the T-Mobile phone). Additionally,

> "[T]he many warrant affidavits mention that a Metro PCS cell phone belonging to [defendant] was taken from him while he was in police custody. Yet, that cell phone appears on the B.C.I. seizure report and photographs taken at the apartment at 9:22 a.m. reveal that the Metro PCS cell phone was on the dining room table at the apartment at that time. In other testimony and at least one warrant affidavit, it says that it was the T-Mobile cell phone that was taken from * * * [d]efendant's person."

- 7 -

report[7] entered into evidence at the suppression hearing, at 8:09 a.m. a call was placed from the LG phone to the phone's voicemail account. The hearing justice determined that, because the apartment had been secured at that point, a Cranston police officer must have placed the call during the course of the investigation. Additionally, photographs of the apartment make it apparent that, throughout the morning, officers picked up and moved the Metro PCS phone.

## B

### The Interrogation[8]

While Sgt. Kite and the BCI detectives remained at the apartment, Det. Jean Slaughter and Det. John Cardone interrogated defendant at the police headquarters for nearly three hours, during which time defendant signed a form waiving his Miranda[9] rights. Throughout the entire interview, the detectives continuously raised the topic of defendant's incriminating text messages to Oliver. At various points during the interview, Det. Slaughter and Det. Cardone left the interview room to consult with other officers, specifically about the content of the text messages on the LG phone. It is unclear whether the interrogating detectives saw the texts or photographs thereof firsthand, or were relayed the contents verbally; what is clear is that, during the course of the interrogation, the detectives were made aware of the incriminating text messages and

---

[7] The extraction report, created pursuant to a June 8, 2012 warrant, was entered into evidence as state's exhibit 32, and reveals, in detail, the contents of the phone, including: incoming/outgoing calls, text messages sent/received, alerts from the service provider, and any other information that remained on the phone at the time of extraction.

[8] The CD recording of the interview entered into evidence at the suppression hearing is not contained in the record certified to this Court. The majority of the direct and cross-examinations of the two interrogating officers consists essentially of state and defense counsel playing clips of the recording and asking questions based on the recording. The interrogating detectives were seemingly unable or unwilling to recall any specifics regarding the interview that were not specifically contained on the recording. Detective Slaughter's repeated unwillingness to acknowledge his own conduct, even after having the recording played for him in open court, clearly frustrated the hearing justice.

[9] Miranda v. Arizona, 384 U.S. 436 (1966).

adjusted their questioning tactics accordingly.[10] After reentering the interrogation room, the detectives became much more aggressive in an apparent attempt to leverage the text messages against defendant. Detective Cardone threatened defendant that he would likely be charged with Marco's murder,[11] and he began to quote some of the texts in which defendant allegedly admitted to being physical with Marco.

Although defendant was initially unwilling to acknowledge his participation in the text messaging, as well as any physical contact with Marco, the more of the text messages the detectives revealed, the more defendant admitted. Detective Slaughter then began explaining the possibility of leniency if defendant confessed; after which defendant admitted playing with Marco before he died, even admitting that he hit him in the ribs. Toward the end of the interrogation, Det. Slaughter made a direct reference to the text message Sgt. Kite had viewed earlier that morning regarding the marks on Marco's neck. At this point, the detectives left defendant alone in the interrogation room to write a formal statement.

Upon returning to the interrogation room, Det. Slaughter reviewed defendant's statement and noticed that it did not include some of the language that defendant had used earlier in the interview with regard to striking Marco. Detective Slaughter suggested to defendant that he include the specific language; defendant obliged the officer and added a statement about Marco taking a "body shot." The defendant then initialed the statement at the detective's request.[12]

---

[10] The testimony at the hearing was extraordinarily unhelpful in this regard as Sgt. Walsh, as well as Det. Slaughter and Det. Cardone, could not recall anything that occurred outside of the interrogation room.

[11] Marco was still alive at the time of the interrogation.

[12] The hearing justice excluded from use at trial defendant's confession as well as significant portions of the recorded and transcribed interrogation. The hearing justice found that the detectives' coercive interrogation tactics violated defendant's due process rights. The state did not appeal the exclusion of the confession or the interrogation materials; therefore, the due process issues are not before this Court.

Shortly thereafter, defendant was handcuffed and placed in a holding cell, and Det. Slaughter and Det. Cardone left for Hasbro Children's Hospital to continue the investigation.

## C

## The Hospital

At 12:30 p.m. on October 4, 2009, while at Hasbro Children's Hospital, Trisha Oliver gave what would be the first of two formal, written statements to Cranston police personnel. In the statement, she explained that on October 3, 2009, at around 3 p.m. she heard Marco throw up, so she cleaned his clothes and gave him a shower. She also stated that defendant had been at her apartment, but left at approximately 3:50 p.m., and eventually returned at approximately 11 that same night. She stated that "[defendant] said he went to go hit [Marco] and [Marco] moved causing him to hit my son in the stomach." She further stated that although she slept intermittently, Marco continued vomiting throughout the night. When she finally woke up at about 6:10 a.m. the next morning to check on Marco, she noticed he was not breathing, at which point she called 9-1-1 and administered CPR.

Approximately one hour later at around 1:30 p.m., Det. Cardone and Det. Slaughter arrived at the hospital to check on Marco and speak with family and friends about a possible child-abuse situation. Doctor Christine Fortin provided the detectives with her initial report, which explained that Marco was in critical condition and that the nature of the injuries suggested evidence of child abuse. Shortly thereafter, Det. Cardone and Det. Slaughter administered a second rights form to Oliver and presented her with a "consent to search form" for the LG cell phone, which she signed.

Despite the best efforts of both the rescue and medical personnel, at 5:05 p.m., Marco succumbed to his injuries and died. At 6 p.m., Det. Cardone took a second, more detailed

written statement from Oliver concerning the events that had taken place on October 3, 2009. Although the timeline regarding Marco's deteriorating physical condition was basically the same as in her first written statement, this statement had particular focus on defendant's involvement with the situation. For instance, Oliver said that she asked defendant what happened and "[defendant] said Marco was 'acting stupid and I hit him.'" This latter statement also included information about her strained relationship with defendant, specifically that she was "afraid of [defendant] because in the past his temper gets * * * out of control. He throws things and sometimes [gets] [physical] with me."

## D

### The Warrants

Throughout the course of the investigation into Marco's death, the Cranston police obtained more than a dozen search warrants, several of which yielded text messages that incriminated defendant. Members of the Cranston Police Department began seeking various search warrants as early as the morning of October 4, 2009, up through the time of the at-issue suppression hearing in August 2012. The various warrants allowed for the search and seizure of evidence at the scene, the contents of various cell phones, and the records of the service providers of the cell phones.

The hearing justice was troubled by the "inconsistencies and uncertainties" surrounding particular information contained in the various affidavits in support of search warrants presented throughout the investigation. Likewise, the hearing justice was troubled by the various officers' testimonies, in that, in her estimation, "[they] knew more about this examination than they were willing to divulge [at the suppression hearing]." However, due to the length and density of the at-issue warrants and affidavits, we will not needlessly recount the challenged statements

- 11 -

contained in the warrant affidavits; rather, the relevant facts pertaining to defendant's warrant challenges will be addressed as necessary, infra.

E

**Procedural History**

On April 2, 2010, defendant was indicted on a single count of first-degree murder[13] for the death of Marco Nieves. Prior to trial, defendant filed motions in limine to exclude text messages, including those sent by and to Trisha Oliver. In addition, defendant filed eight motions to suppress evidence that had been seized during the course of the October 4, 2009 investigation, as well as all the information seized from the different cell phones, on the grounds that the collection of such evidence violated his rights against unreasonable searches and seizures in violation of the Fourth Amendment to the United States Constitution and article 1, sections 6 and 13 of the Rhode Island Constitution.[14] The defendant also argued that his videotaped and written statements taken on October 4, 2009, resulted from coercive and threatening police tactics, and thus were made involuntarily in violation of his due process rights under the United States and Rhode Island Constitutions.

On June 18, 2012, the Superior Court embarked on a multi-week series of evidentiary hearings to address the issues raised by defendant in his pretrial motions. On June 29, 2012, after the start of the evidentiary hearing, defendant filed an amended motion seeking a Franks hearing, arguing that the evidence adduced at the suppression hearing indicated that members of

---

[13] G.L. 1956 § 11-23-1.

[14] Specifically, defendant filed motions to suppress: (1) evidence seized on or about October 4, 2009; (2) all information seized from defendant's T-Mobile phone; (3) all information seized from Oliver's LG phone; (4) all information seized from Marco's biological father, Rafael Nieves's phone; (5) all information seized from defendant's friend, Mario Palacio's phone; (6) all information seized from Oliver's landline phone; (7) the 8mm videotape of the crime scene; and (8) all information seized from the Metro PCS phone.

- 12 -

the Cranston Police Department made numerous material misrepresentations in their affidavits to obtain warrants throughout the course of the investigation.

On September 4, 2012, the hearing justice rendered a one-hundred-ninety page decision and an order granting defendant's motions to suppress the evidence seized at the scene and all information seized from the various cell phones, including all of the text message evidence. The hearing justice denied defendant's motion to suppress the videotape of the crime scene. In granting virtually all of defendant's motions to suppress, the hearing justice made comprehensive findings with respect to defendant's constitutional claims.

First, with respect to standing, the hearing justice found that "[d]efendant has a reasonable expectation of privacy in his alleged text messages," so as to confer upon him standing to challenge the police search that led to the discovery of the text messages. The hearing justice also found that "people have a reasonable expectation of privacy in the contents of their text messages with no distinction between whether the messages were sent or received by them," and "that the third-party doctrine should not apply to diminish the expectation of privacy in the contents of electronic communications." The hearing justice also found that, as a frequent overnight guest, defendant had standing to challenge the search and seizure of evidence in Oliver's apartment.

Second, the hearing justice found that Sgt. Kite's action of viewing the text messages on the LG phone during the initial stages of the October 4, 2009 sweep of Oliver's apartment did not fall within the exigent circumstances, plain view, or consent exceptions to the warrant requirement, and therefore constituted an unreasonable search. The hearing justice also found that the searches and seizures by the police of all the cell phones in evidence, as well as the

- 13 -

photographs taken of the contents thereof, were either "illegal as warrantless or in excess of the warrants obtained," and, thus, were also unreasonable in violation of the Fourth Amendment.

Finally, the hearing justice found that "almost all the evidence the Cranston Police Department obtained during the course of its investigation into the death of Marco Nieves was 'tainted' by the illegal search made by Sgt. Kite or the other illegal searches and seizures of cell phones and their contents," and was thereby inadmissible at trial as fruit of the poisonous tree.[15]

In regard to defendant's <u>Franks</u> motion, the hearing justice found that there existed sufficient evidence in the record to "find that [d]efendant made a preliminary showing that the affidavits for the warrants do contain certain false statements, as specifically identified by [d]efendant, that were deliberate or made in reckless disregard of the truth." Despite these preliminary findings, however, the hearing justice reserved decision as to whether defendant was entitled to a <u>Franks</u> hearing, "subject to further argument as to standing and probable cause."

On September 12, 2012, the state timely appealed the hearing justice's decision. That same day, the hearing justice entered an order that the ongoing trial proceedings relative to the <u>Franks</u> motion were not to be stayed by operation of law or in the discretion of the hearing justice, and that, absent a stay by this Court, the proceedings were to continue forthwith.

_____

[15] Specifically, the hearing justice excluded from use at trial the following pieces of evidence: (1) the LG phone; (2) the Metro PCS phone; (3) the iPhone; (4) the landline phone; (5) the T-Mobile phone; (6) the photographs of the contents of the LG phone taken at Oliver's apartment; (7) the photographs of the contents of the LG phone taken at police headquarters; (8) the photographs of the contents of the Metro PCS phone; (9) the photographs of the contents of the T-Mobile phone; (10) the contents of the LG phone extracted by use of the Cellebrite software; (11) the phone records and communications of defendant provided by T-Mobile; (12) the phone records and communications of Mario Palacio provided by T-Mobile; (13) the phone records and communications of Oliver provided by Verizon; (14) the phone records and communications of Rafael Nieves provided by Sprint Nextel; (15) the phone records and communications of defendant's sister, Angie Patino, provided by Sprint Nextel; (16) the landline phone records for the apartment provided by Cox Communications; (17) certain portions of defendant's interrogation as memorialized on videotape and in a written transcript; and (18) defendant's confession regarding the death of Marco Nieves.

Thereafter, the state filed with this Court a motion to compel compliance with § 9-24-33 to stay the Franks proceedings in the Superior Court until after resolution of the other issues on appeal. On September 25, 2012, this Court granted the state's motion,[16] determining that "because § 9-24-33 provides for a stay of any further proceedings with respect to those findings pending the State's appeal, all further proceedings are stayed until further Order of this Court."

## II

### Standard of Review

"When reviewing a trial justice's decision granting or denying a motion to suppress, we defer to the factual findings of the trial justice, applying a clearly erroneous standard." State v. Cosme, 57 A.3d 295, 299 (R.I. 2012) (quoting State v. Storey, 8 A.3d 454, 459-60 (R.I. 2010)). "With respect to questions of law and mixed questions of law and fact involving constitutional issues, however, this Court engages in a de novo review in accordance with Ornelas v. United States, 517 U.S. 690 * * * [(1996)]."[17] State v. Linde, 876 A.2d 1115, 1124 (R.I. 2005) (quoting State v. Apalakis, 797 A.2d 440, 443 (R.I. 2002)).

This Court reviews a hearing justice's determination of a defendant's right to a Franks hearing with deference. State v. Verrecchia, 880 A.2d 89, 99 (R.I. 2005); see State v. DeMagistris, 714 A.2d 567, 576 (R.I. 1998) ("[W]e review a lower court's determination that the defendant failed to satisfy the Franks standard with deference.").[18]

---

[16] Justice Indeglia dissented.

[17] In Ornelas v. United States, 517 U.S. 690, 699 (1996), the Supreme Court held that "determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal," however, "[reviewing courts] should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges."

[18] Although this Court is always deferential to a hearing justice's determination of whether a Franks hearing is appropriate, the specific standard has not always been consistent. Compare,

- 15 -

## III

## Analysis

The Fourth Amendment to the United States Constitution and violations thereof are predicated upon one's reasonable expectation of privacy. Smith v. Maryland, 442 U.S. 735, 740 (1979). Before delving into the question of what is "reasonable" in this day and age of rapidly evolving technology, however, it may be useful to provide an initial framework with respect to how, and for what purpose, the Fourth Amendment operates.

The Fourth Amendment to the United States Constitution provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."[19]

The purpose of the Fourth Amendment, as well as its Rhode Island counterpart, is to "guarantee[] the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government * * * ." Skinner v. Railway Labor Executives' Association, 489 U.S. 602, 613-14 (1989).

In order to avoid such arbitrary and inconsistent enforcement of Fourth Amendment principles, "the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." Smith, 442 U.S. at 740. Put another way, "a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that

---

State v. Demasi, 452 A.2d 1150, 1153 (R.I. 1982) (applying clearly erroneous standard) with State v. McGoff, 517 A.2d 232, 237 (R.I. 1986) (applying abuse of discretion standard).

[19] The provision of the Rhode Island Constitution protecting against illegal searches and seizures is virtually identical to the United States Constitution. See R.I. Const. art. 1, sec. 6.

society recognizes as reasonable." <u>Kyllo v. United States</u>, 533 U.S. 27, 33 (2001). The question of whether a search and seizure is unreasonable under the Fourth Amendment is based on the totality of the facts and circumstances of each case. <u>Cooper v. California</u>, 386 U.S. 58, 59 (1967).

**A**

**Standing**

It is well settled that "'Fourth Amendment rights are personal rights' and cannot be 'asserted vicariously by a defendant merely because he or she may be aggrieved by the introduction of damaging evidence.'" <u>State v. Quinlan</u>, 921 A.2d 96, 109 (R.I. 2007) (quoting <u>State v. Bertram</u>, 591 A.2d 14, 18 (R.I. 1991)); <u>see</u> <u>Rakas v. Illinois</u>, 439 U.S. 128, 133 (1978). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his [or her] Fourth Amendment rights infringed." <u>Rakas</u>, 439 U.S. at 134. Therefore, in order to successfully invoke the protections of the Fourth Amendment, as a threshold matter, a "defendant bears the burden of establishing the requisite standing to challenge the legality of the search." <u>Quinlan</u>, 921 A.2d at 109.

"A party has standing when he or she is found to have a reasonable expectation of privacy in the area searched or the thing seized." <u>Quinlan</u>, 921 A.2d at 109; <u>see</u> <u>Katz v. United States</u>, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). "In Rhode Island, 'we employ a two-step process to determine from the record whether a legitimate expectation of privacy sufficient to invoke Fourth Amendment protection exists.'" <u>State v. Briggs</u>, 756 A.2d 731, 741 (R.I. 2000) (quoting <u>State v. Jimenez</u>, 729 A.2d 693, 696 (R.I. 1999)); <u>see</u> <u>Katz</u>, 389 U.S. at 361. "First we determine whether the defendant 'exhibited an actual (subjective) expectation of privacy' and if that expectation is established, then we consider 'whether, viewed objectively,' the defendant's

expectation was reasonable under the circumstances." Briggs, 756 A.2d at 741 (quoting Jimenez, 729 A.2d at 696); see Katz, 389 U.S. at 361. "Usually, the second part of the test, i.e., whether the asserted expectation of privacy was objectively reasonable, is the most disputed." Briggs, 756 A.2d at 741 (quoting Commonwealth v. Krisco Corp., 653 N.E.2d 579, 582 (Mass. 1995)).

When deciding whether the expectation of privacy is objectively reasonable, "no single factor invariably will be determinative." Quinlan, 921 A.2d at 109 (quoting State v. Casas, 900 A.2d 1120, 1129-30 (R.I. 2006)); see Rakas, 439 U.S. at 152. In the past, this Court has looked to several factors to determine objective reasonableness, including: "whether the suspect possessed or owned the area searched or the property seized; his or her prior use of the area searched or the property seized; the person's ability to control or exclude others' use of the property; and the person's legitimate presence in the area searched." State v. Verrecchia, 766 A.2d 377, 382 (R.I. 2001).

In addition to examining the aforementioned, case-specific factors to determine reasonableness, courts also look backwards to history, see Rakas, 439 U.S. at 153 ("The Court on occasion also has looked to history to discern whether certain types of government intrusion were perceived to be objectionable by the Framers of the Fourth Amendment"), as well as forward, considering modern technological developments. See United States v. Jones, 132 S.Ct. 945, 962 (2012) (Alito, J., concurring) ("[T]echnology can change those expectations [of privacy]. Dramatic technological change may lead to periods in which popular expectations are in flux and may ultimately produce significant changes in popular attitudes."); City of Ontario, California v. Quon, 560 U.S. 746, 748 (2010) (acknowledging that "[r]apid changes in the dynamics of communication and information transmission are evident not just in the technology itself but in what society accepts as proper behavior").

In the case under review, the hearing justice made numerous findings with respect to defendant's standing to challenge the various searches and seizures by the Cranston Police Department. For instance, she found that "[d]efendant presented substantial evidence to establish that he had a reasonable expectation of privacy in [Oliver's] apartment," which was "sufficient to confer upon him the standing required for him to challenge its search and the seizure of items found there." The hearing justice also found that defendant had standing to challenge the search and seizure of the contents of his text message conversations with Oliver, stored in her LG phone. She reached this decision by rejecting the analogy of a cell phone to a "closed container," finding that defendant's standing "does not * * * rise and fall based on his interest in the LG cell phone."[20] She then undertook the two-tiered inquiry and found that defendant exhibited a subjective expectation of privacy in the content of his text messages and that "it is objectively reasonable for people to expect the contents of their electronic text messages to remain private."

In determining that defendant's expectation of privacy in his sent and received text messages was objectively reasonable, the hearing justice embarked on an extensive analysis in which she examined the increasing role that cell phones and text messages play in modern society. In addition, she rejected the comparison of text messaging to other similar forms of communication, such as telephone conversations and email exchanges, and determined that text messages "are a technological and functional hybrid," and thus, she "[would] not strain * * * to apply existing law based on imperfect analogies." Although she likened text messaging to oral communication based on their similar back-and-forth nature, she acknowledged that the analogy

---

[20] The hearing justice noted that, if standing in the LG phone were predicated on the actual device, as opposed to the content of the text messages, she "would be constrained to conclude that [d]efendant ha[d] failed to demonstrate a sufficient privacy interest in the LG cell phone to establish standing in the device itself."

is not perfect, and that "text messages are more vulnerable to discovery than oral communications, which in itself may cause individuals to have less of a subjective expectation of privacy in the content of those communications." Despite the admittedly diminished expectation of privacy, she nevertheless found that "a person has a reasonable expectation of privacy in the contents of his or her text messages." She therefore held that "[d]efendant possesse[d] standing to challenge the actions of the Cranston Police Department in searching the LG cell phone and viewing his alleged text messages to and those messages from Trisha Oliver."

The state argues that defendant does not have standing to challenge the search of Oliver's LG phone and, further, that defendant cannot claim standing in the phone merely because Oliver had used it to exchange text messages with him. The defendant, on the other hand, argues that people have an objectively reasonable expectation of privacy in the content of their text messages. However, the crux of defendant's argument on appeal is not defendant's standing in the text messages, but rather his standing, by virtue of his frequent overnight stays, to challenge the warrantless search of Oliver's apartment. In that vein, defendant argues that Sgt. Kite was not lawfully in the apartment when he searched the LG phone and that, therefore, all the evidence seized as a result of that unlawful search should be excluded at trial.

Before addressing the expectation of privacy in the text message communications, we first dispel defendant's contention that, because he has standing to challenge the search of Oliver's apartment, everything seized without a warrant is subject to suppression as violative of his Fourth Amendment rights. Although the evidence adduced at the hearing below indicates, and the state does not contest, that defendant, as a frequent overnight guest at Oliver's apartment, did have a reasonable expectation of privacy in her apartment, this does not end our inquiry. See Minnesota v. Olson, 495 U.S. 91, 96-97 (1990). In order to raise a Fourth Amendment

challenge, it is not sufficient that a defendant merely have standing in the area searched; he must also have an expectation of privacy in the item seized. See United States v. Haqq, 278 F.3d 44, 50 (2nd Cir. 2002) ("when considering the legality of a search of an object within a home, courts have properly focused on the defendant's expectation of privacy in the object apart from his expectation of privacy in the home"); United States v. Garcia-Rosa, 876 F.2d 209, 219-20 (1st Cir. 1989) (homeowner lacked a reasonable expectation of privacy in a box located in his wife's dresser where he claimed no interest in the box or its contents); Wayne R. LaFave et. al., Criminal Procedure § 9.1(b) n.51 at 389 (3d ed. 2007) ("A person in possession of premises has standing with regard to a search of those premises and also a seizure of the objects therein, * * * but does not also have standing as to the search of a container belonging to another in the premises."). We therefore must determine if defendant had a reasonable expectation of privacy in the items searched and seized; specifically, the LG phone and the text messages evidenced therein.

Moreover, we reject defendant's contention that "[Sgt.] Kite's presence in the home when he searched the LG cell phone * * * at approximately 7:15 a.m., forty-five minutes after the tour with Trish[a] Oliver and nearly an hour after the minor left, was unconstitutional." The circumstances of the case were that the Cranston police had responded to a 9-1-1 call for a medical emergency. Upon arriving at the scene they encountered an unresponsive child and obvious signs of nauseous distress. After the child and Oliver left for the hospital, there still remained a second young child (Jazlyn) and defendant, who was not a tenant of the apartment. It is our opinion that, under these circumstances, an hour was not an unreasonable amount of time for Sgt. Kite and other police officers to remain on the scene. To the extent that the trial justice

found that the police were not lawfully in the apartment after Marco and Oliver had been transported to the hospital, it is our opinion that her finding was clear error.

### 1. Expectation of Privacy in Text Messages

Although text messaging has enjoyed a precipitous rise in usage and popularity, it is still a relatively new phenomenon and, as is often the case with new technology, courts may struggle to adapt existing legal principles to new realities. It is often not easy to pour new wine into old wineskins, yet wise stewardship might suggest the use of the old skins until they burst. So too, legal principles and rules of law developed in the context of more antediluvian forms of communication may provide useful guidance for our analysis of the issues presented in this case. As this Court has previously recognized, "the evolution of the common law should occur gradually, predictably, and incrementally." State v. Lead Industries Association, Inc., 951 A.2d 428, 454 (R.I. 2008). The central question confronting us in this case is relatively narrow, viz., whether a person has a reasonable expectation of privacy in his or her text messages stored in a cell phone belonging to, or possessed by, another person. Because it is an issue of first impression in this state, we will look to other jurisdictions, as well as our own jurisprudence, to determine whether that particular expectation of privacy is one that society is willing to recognize as objectively reasonable.

Several courts throughout the country have recently opined as to whether a person has an objectively reasonable expectation of privacy in his or her text messages. These courts, much like the hearing justice in the instant case, have drawn parallels between text messages and other forms of communication to aid in their ultimate determination. See, e.g., United States v. Zavala, 541 F.3d 562, 577 (5th Cir. 2008) (comparing a cell phone to a personal computer carried on one's person); State v. Clampitt, 364 S.W.3d 605, 611 (Mo. Ct. App. 2012) (analogizing text

messages to email); State v. Smith, 920 N.E.2d 949, 955 (Ohio 2009) (rejecting a comparison to address books or laptops because, "[g]iven their unique nature as multifunctional tools, cell phones defy easy categorization"); State v. Hinton, 319 P.3d 9, 14 (Wash. 2014) (although decided on state constitutional grounds, the court stated that "[w]hile text messages have much in common with phone calls and letters, they are a unique form of communication, and we will not strain to apply analogies where they do not fit").

Although courts have ultimately reached different conclusions on whether there exists a reasonable expectation of privacy in text messages, the determinations have most often turned on whether the defendant owned or was the primary user of the cell phone. See, e.g., United States v. Finley, 477 F.3d 250, 259 (5th Cir. 2007) (holding that the defendant had a reasonable expectation of privacy in a cell phone because, inter alia, he "maintained a property interest in the phone, [and] had a right to exclude others from using the phone"); United States v. Jones, 149 F.App'x 954, 959 (11th Cir. 2005) (holding that the defendant did not have a reasonable expectation of privacy in his sent text messages contained on his coconspirator's cell phone); United States v. Davis, 787 F.Supp.2d 1165, 1170 (D. Or. 2011) (holding that the defendant had "a reasonable expectation of privacy in his or her personal cell phone, including call records and text messages"); State v. Boyd, 992 A.2d 1071, 1081 (Conn. 2010) (holding that because the defendant "owned the cell phone and exercised exclusive control over it * * * he had a reasonable expectation of privacy in the cell phone"); State v. Bone, 107 So.3d 49, 66 (La. Ct. App. 2012) (holding that the defendant, as "the exclusive user of the cell phone" had "a reasonable expectation of privacy in the text messages sent and received on the cell phone"); Clampitt, 364 S.W.3d at 611 (holding that the defendant had a reasonable expectation of privacy

- 23 -

in the text messages and other information contained in his phone, notwithstanding the fact that the information was disclosed to a third-party cell service provider).

In determining whether a person has an expectation of privacy in his text messages, the most important factor, in our opinion, is from whose phone the messages are accessed. Underlying this consideration is the element of control; that is to say, when the recipient receives the message, the sender relinquishes control over what becomes of that message on the recipient's phone. The idea of control has been central to our prior determinations of whether an individual has an objectively reasonable expectation of privacy so as to confer standing to raise a Fourth Amendment challenge. See Verrecchia, 766 A.2d at 382 (factoring, inter alia, whether suspect possessed or owned the property seized; and, his or her ability to control or exclude others). The United States Supreme Court has likewise considered control as a factor when determining whether a defendant has a reasonable expectation of privacy in a given place or item. See, e.g., Rakas, 439 U.S. at 154 (noting the distinction "between the Fourth Amendment rights of passengers and the rights of an individual who has exclusive control of an automobile or of its locked compartments") (emphasis added). Additionally, the Supreme Court has determined that, "when an individual reveals private information to another," a reasonable expectation of privacy no longer exists because "he assumes the risk that his confidant will reveal that information to the authorities." United States v. Jacobsen, 466 U.S. 109, 117 (1984); see United States v. Miller, 425 U.S. 435, 443 (1976).

Implicit in the risk inherent in the disclosure of information to another party is the relinquishment of control, i.e., the sender can no longer control what the recipient does with the message. See, e.g., United States v. King, 55 F.3d 1193, 1196 (6th Cir. 1995) ("the sender's expectation of privacy ordinarily terminates upon delivery * * * even though the sender may

- 24 -

have instructed the recipient to keep the letters private"); United States v. Maxwell, 45 M.J. 406, 418 (C.A.A.F. 1996) (although a sender of an email enjoys a reasonable expectation of privacy, "once the transmissions are received by another person, the transmitter no longer controls its destiny"). Because the recipient now shares full control of whether to share or disseminate the sender's message, the sender, to be sure, no longer enjoys a reasonable expectation of privacy in the digital copy of the message contained on the recipient's device.[21] With these considerations in mind, we turn to the facts of the instant case to determine whether defendant had standing to raise a Fourth Amendment challenge.

It is clear to us that the cell phone of primary concern in this case, the LG phone, was used exclusively by Trisha Oliver. The defendant exhibited no dominion or control, nor did he attempt to exclude others from accessing the phone. This is evinced by the facts that he made no motion towards the phone in response to the message alert, did not attempt to prevent Sgt. Kite from accessing the contents of the phone, and did not bring the phone with him when he accompanied Officer Machado to the police station. In fact, defendant's only connection to the LG phone is the fact that a digital copy of the messages he sent from his T-Mobile phone existed on the LG phone. Having already sent the incriminating text messages, which were indeed delivered to Oliver's LG phone, defendant no longer had any control over what became of the messages contained in that phone. The defendant's lack of control over who could view or access the text messages is underscored by the fact that Oliver signed a consent form allowing the Cranston police officers to search her phone, albeit after they had already viewed the incriminating messages. Therefore, in light of the considerations and rationale enunciated above,

---

[21] We can think of no media more susceptible to sharing or dissemination than a digital message, such as a text message or email, which vests in the recipient a digital copy of the message that can be forwarded to or shared with others at the mere click of a button.

it is our considered opinion that defendant did not have an objectively reasonable expectation of privacy in any text messages contained in Trisha Oliver's LG phone, whether sent by defendant, sent to defendant, or otherwise. It necessarily follows that, having no reasonable expectation of privacy in the LG phone or the messages contained therein, defendant did not have standing to challenge the search and seizure thereof.

When recently confronted with facts similar to the instant case, i.e., privacy expectations of text messages contained on the phone of another, the Washington Supreme Court did not reach the issue of expectation of privacy in the Fourth Amendment context, opting instead to decide the case on independent state constitutional grounds. Hinton, 319 P.3d at 11, 14. We agree wholeheartedly with the dissent in that case, however, which, in arguing that the defendant lacked standing to challenge the search, stated that:

> "[The sender] did not have a reasonable expectation of privacy in [the recipient's] cell phone. He had neither possession nor control of the cell phone, and he did not have the right to exclude others from using it. Furthermore, once the text message was delivered to [the recipient's] cell phone, [the sender] had no control over who viewed it. * * * [The recipient] could have simply shared the contents of the message with others. [The sender] assumed the risk that, once sent, the message would no longer be kept private." Id. at 22 (Johnson, J., dissenting).

We hold, therefore, that defendant's reasonable expectation of privacy in the text messages contained in Oliver's phone, whether sent from or received by that phone, does not extend to the messages contained on another's phone, despite the fact that there exists an identical copy of the messages on the challenger's phone.[22] As iterated above, this is chiefly due to control; a cell phone user retains control over what becomes of the content on his or her

---

[22] Because defendant was not under arrest when he relinquished his phone at the Cranston police headquarters, we save for another day the issue of whether one's personal cell phone can be subject to a warrantless search incident to a valid arrest.

phone, but entirely loses control of the messages contained on the phone of another. When applied to the case at hand, therefore, we conclude that defendant had no reasonable expectation of privacy, and thus no standing to challenge the search and seizure of Oliver's LG phone, its contents, and all derivatives therefrom.[23]

We vacate, therefore, the September 12, 2012 order of the Superior Court insofar as it excludes from evidence "the LG cell phone"; "the pictures of the contents of the LG cell phone taken at Trisha Oliver's apartment"; "the pictures of the contents of the LG cell phone taken at Cranston Police Department headquarters"; "the Cellebrite extraction report for the LG cell phone"; and "the phone records and communications of Trisha Oliver provided by Verizon."

We further vacate the order insofar as it excludes from trial evidence that the hearing justice found to be "tainted" as fruits of the poisonous tree.[24] Such evidence consists of "the phone records and communications of Mario Palacio provided by T-Mobile"; "the phone records and communications of Angie Patino provided by Sprint Nextel"; and "the landline phone records for Trisha Oliver's apartment provided by Cox Communications."

**B**

**The T-Mobile and Metro PCS Cell Phones**

The hearing justice made several damaging findings with respect to the legality of the searches and seizures of all four cell phones discovered in Oliver's apartment. She reasoned that the police "focused on the cell phones and text messages at the earliest stages of the investigation and well before they sought or obtained the first search warrant for the apartment." She

---

[23] This includes the photographs of the contents of the LG phone taken at the police station and at Trisha Oliver's apartment; the Cellebrite extraction report from the phone; and the records of the phone obtained from Verizon.

[24] The fruit of the poisonous tree doctrine dictates that "physical, tangible materials obtained either during or as a direct result of an unlawful invasion" are traditionally excluded from use at trial. Wong Sun v. United States, 371 U.S. 471, 485 (1963).

explained that "the abysmal handling of the evidence by the police in this case—specifically the critical cell phones at issue—play[ed] into [her] view that the police seized and searched all of these cell phones without a warrant." She thus concluded that the Cranston Police Department "engaged in an illegal warrantless search and seizure of all of the phones in evidence and the contents of those phones, including the LG cell phone, the Metro PCS cell phone, the T-Mobile cell phone, the iPhone, and the [landline], in violation of [d]efendant's rights under the Fourth Amendment."[25]

The state concedes that defendant had standing with respect to his own cell phones—the T-Mobile and Metro PCS phones—but it appeals the hearing justice's decision concerning said phones only with respect to defendant's challenge under Franks v. Delaware, 438 U.S. 154 (1978), arguing that "[t]he relevant affidavits were more than sufficient to establish probable cause, even with the removal of the materials identified by the hearing justice." We first note that, with respect to the Franks challenges, the hearing justice determined only that defendant had made a substantial preliminary showing that the warrant applications contained materially false statements. Thus, the sufficiency of any additional evidence establishing probable cause has not been determined.

With respect to the legality of the searches and seizures, however, the state raises only a cursory challenge to the hearing justice's finding as it pertains to the T-Mobile and Metro PCS cell phones. We have often stated that "[s]imply stating an issue for appellate review, without a meaningful discussion thereof or legal briefing of the issues, does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that issue." State v. Chase, 9 A.3d 1248, 1256 (R.I. 2010) (quoting Wilkinson v. State Crime Laboratory Commission, 788

---

[25] As described in Part III, Section A(1), supra, we vacate the order granting defendant's motions to suppress as it pertains to the LG phone and the landline.

A.2d 1129, 1131 n.1 (R.I. 2002)); see Article I, Rule 16(a) of the Supreme Court Rules of Appellate Procedure ("Errors not claimed, questions not raised and points not made ordinarily will be treated as waived and not be considered by the Court."). Because the state does not meaningfully contest the hearing justice's findings regarding the T-Mobile and Metro PCS cell phones, we consider the issue waived.[26] Accordingly, we affirm the Superior Court order suppressing evidence of "the Metro PCS phone," "the iPhone," "the T-Mobile cell phone," and "the pictures of the contents of the Metro PCS [and T-Mobile] cell phone[s]."

## C

### Franks Determination

Having made our determinations regarding defendant's standing to challenge the various items of evidence, as well as the legality of the searches, we address briefly the hearing justice's Franks determinations. In Franks, the United States Supreme Court established a procedure for challenging warrants alleged to have been obtained through the use of affidavits containing "false statement[s] made knowingly and intentionally, or with reckless disregard for the truth." Franks, 438 U.S. at 155-56; see Verrecchia, 880 A.2d at 99. Franks established a procedure under which a defendant may challenge the veracity of factual statements made in affidavits supporting the issuance of Fourth Amendment search warrants. Before a hearing is required, however, the defendant must vault over two hurdles. First, he must make a "substantial preliminary showing that a false statement [was made] knowingly and intentionally, or with reckless disregard for the truth * * * ." Franks, 438 U.S. at 155. Secondly, the defendant must

---

[26] It is unclear to us who owned the iPhone at issue. Similar to the T-Mobile and Metro PCS cell phones, however, the state failed to raise a meaningful argument challenging the hearing justice's order suppressing its admission into evidence at trial.

show that the allegedly false statement is necessary to the finding of probable cause. Id. at 156. Only then is the defendant entitled to a Franks hearing.

Moreover, because a Franks hearing concerns the Fourth Amendment warrant requirement, in order to raise a Franks challenge, a defendant must establish standing in the area or items sought to be searched and seized by the challenged warrant. See Rakas, 439 U.S. at 133-34; Quinlan, 921 A.2d at 109; e.g., United States v. Mastromatteo, 538 F.3d 535, 544 (6th Cir. 2008) ("Determining that a defendant has Fourth Amendment standing is a prerequisite to granting a motion for a Franks hearing."). We review a court's Franks determination with deference. Verrecchia, 880 A.2d at 99.

On appeal, the state raises two challenges with respect to the hearing justice's Franks determinations. First, the state argues that, "except with respect to defendant's own phones, he has no standing to make a Franks challenge." Second, the state avers that "[b]ecause, with respect to his own phones, the relevant affidavits were more than sufficient to establish probable cause, even with the removal of the materials identified by the hearing justice, the lower court's Franks determinations cannot stand." We need not address either contention.

In light of our prior determinations on standing, discussed supra, we agree with the state and hold that defendant, who lacked a reasonable expectation of privacy in the items sought by several of the warrants,[27] did not have standing to raise a Franks challenge to those warrants. We therefore need not address the hearing justice's preliminary findings with respect to those warrants. Furthermore, because, as discussed supra, we uphold the hearing justice's findings that

---

[27] The defendant has not satisfied his burden of establishing standing to challenge the following warrants: an October 4, 2009 warrant to search the LG phone; three October 6, 2009 warrants seeking the phone records of, respectively, Mario Palacio, Trisha Oliver, and Rafael Nieves; and two October 8, 2009 warrants seeking records of, respectively, Angie Patino's cell phone and Trisha Oliver's apartment landline phone.

the Metro PCS cell phone, the T-Mobile phone, and the iPhone were searched and seized illegally, the state is precluded from introducing those items at trial, rendering moot defendant's challenges to the warrants seeking those items and their derivatives.

To the extent that any of the warrants yet have vitality, we perceive no basis to disturb the hearing justice's finding that the defendant has made a substantial preliminary showing that the warrant affidavits contain certain false statements that were deliberate or made in reckless disregard for the truth. We caution, however, that, before a Franks hearing is warranted, the Superior Court must still determine whether, after disregarding the allegedly false statements, there remain sufficiently reliable allegations in the affidavit to establish probable cause.

## IV

### Conclusion

For the reasons set forth in this opinion, we affirm in part and vacate in part the order of the Superior Court. Specifically, we vacate the September 12, 2012 order insofar as it suppressed the following evidence: "(1) the LG cell phone"; "(5) the apartment landline phone"; "(6) the pictures of the contents of the LG cell phone taken at Trisha Oliver's apartment"; "(7) the pictures of the contents of the LG cell phone taken at Cranston Police Department headquarters"; "(10) the Cellebrite extraction report for the LG cell phone"; "(12) the phone records and communications of Mario Palacio provided by T-Mobile"; "(13) the phone records and communications of Trisha Oliver provided by Verizon"; "(14) the phone records and communications of Rafael Nieves provided by Sprint Nextel"; "(15) the phone records and communications of Angie Patino provided by Sprint Nextel"; and "(16) the landline phone records for Trisha Oliver's apartment provided by Cox Communications." We affirm the order

in all other respects.  The record shall be remanded to the Superior Court for further proceedings consistent with this opinion.



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**  State v. Michael Patino

**CASE NO:**  No. 2012-263-C.A.
(P1/10-1155A)

**COURT:**  Supreme Court

**DATE OPINION FILED:**  June 20, 2014

**JUSTICES:**  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**  Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:**  Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Judith C. Savage

**ATTORNEYS ON APPEAL:**

For State:  Aaron L. Weisman
Department of Attorney General

For Defendant:  George J. West, Esq.