November 8, 2017

**Supreme Court**

No. 2016-242-C.A.

(P1/15-2222A)

State                              :

    v.                             :

Daniel Tejeda.                     :

NOTICE:    This  opinion  is  subject  to  formal  revision  before
publication in the Rhode Island Reporter.  Readers are requested to
notify  the  Opinion  Analyst,  Supreme  Court  of  Rhode  Island,
250 Benefit Street, Providence, Rhode Island 02903, at Telephone
222-3258 of any typographical or other formal errors in order that
corrections may be made before the opinion is published.

|  |  |
|---|---|
| State | : |
| v. | : |
| Daniel Tejeda. | : |

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## OPINION

**Justice Indeglia, for the Court.**  On July 2, 2015, a grand jury indicted Daniel Tejeda (Tejeda or defendant) on charges of first-degree murder in violation of G.L. 1956 § 11-23-1.  A Providence County Superior Court jury convicted the defendant on April 14, 2016.  On appeal, the defendant argues that his trial commenced after the 180 days required by the Interstate Agreement on Detainers Act (IAD), G.L. 1956 § 13-13-2, Art. III(a).  He also argues that the trial justice erred in denying his motions to suppress the seizure of his cell phone and the records of that cell phone, as well as the bags, zip ties, and a BB gun retrieved from his apartment. Additionally, he asserts that the trial justice erred in allowing the admission of statements made by him while he was in the hospital.  Finally, he alleges that the sentence imposed upon him was unduly harsh and unwarranted.  For the reasons stated herein, we affirm the judgment of the Superior Court.

- 1 -

# I

## Facts and Travel

## A

## The Murder

On March 31, 2015, Courtney Jewett (Jewett) found her cousin Ashley Masi (Masi or victim) unconscious in Masi's bedroom with a zip tie fastened around her neck. Jewett had been watching Masi's six-month-old child while Masi engaged in prostitution services in her apartment located on River Avenue in Providence. Earlier that afternoon, Masi had posted an advertisement for prostitution services on Backpage.com.[1] In 2015, Masi had been working as an escort for at least five years, and she usually engaged clients through online postings. Generally, when Masi published a post, she received about twenty to thirty responses, from which she usually responded to about ten.

The March 31 posting was no different. Jewett testified that she was with Masi when she "started getting replies for her ad, and her phone was going off like crazy." Shortly after 3 p.m., Masi told Jewett that a client was on his way, but the client wanted to look around the apartment when he arrived. Jewett testified that such a request was not uncommon because many prostitution clients act paranoid. Masi's client entered through the back stairwell, and Jewett testified that she never saw him enter the apartment. Jewett watched Masi's baby in the front hallway while Masi saw the client.

---

[1] We have defined Backpage before as recently as this year. "Backpage is a classified advertising website where individuals can list a variety of products and services. Until January 2017, Backpage included an adult section containing different subcategories of various sex work professions, including escorts and strippers." *State v. Adams*, 161 A.3d 1182, 1187 n. 1 (R.I. 2017) (citing Alastair Jamieson & Tracy Connor, *Backpage Pulls Adult Ads, Blames 'Censorship' After Report on Sex Trafficking, Prostitution* (Jan. 10, 2017), http://www.nbcnews.com/news/us-news/backpage-pulls-adult-ads-blames-censorship-after-report-sex-trafficking-n705056).

Jewett testified that Masi had told her that the client would be there for one hour, so Jewett waited in the hallway with the baby. Initially, Jewett heard a door open and some muffled voices, "[a]s if the gentleman was looking around * * * like he asked her to." After an hour and fifteen minutes passed, Jewett began to worry, especially when Masi did not respond to her text messages. Jewett called Masi's phone, but it was turned off. Around 5:30 p.m., Jewett went upstairs to Masi's apartment, where she found Masi's unconscious body on her bedroom floor with an industrial zip tie tightened around her neck. Masi's shirt was still on her body, but her pants were hanging over a chair. Her face was blue, and the floor beneath her head was covered in blood. Jewett screamed and dialed 9-1-1.[2] Providence police officers responded to the call, but they were unable to remove the zip tie from Masi's neck. The fire department transported her body to the hospital. Masi's time of death was later determined to be 5:56 p.m.

**B**

**The Investigation and the Arrest**

Detective Michael Otrando was assigned to Masi's case, arriving at the River Avenue apartment on March 31 around 6:30 p.m. He took Jewett to the police station to obtain her statement, and he also spoke with Masi's friend, Valerie Kittelt, who gave him Masi's Backpage password. The Backpage advertisement Masi posted on March 31 at 1:07 p.m. included her cell phone number. Masi's phone was not recovered, so Det. Otrando requested from her phone carrier a call log of calls and texts made and sent on March 30 and March 31.

Detective Otrando also interviewed Philip Towns, the father of Masi's six-month-old child. Although Towns was not in a relationship with Masi at the time of her death, he was

---

[2] The dispatcher instructed Jewett to breathe air into Masi's lungs, but Jewett testified that Masi's mouth would not remain open and it appeared that she had blood clots coming out of her mouth. Jewett also attempted to remove the zip tie with a kitchen knife, but the zip tie was too strong.

involved in her life with respect to their child. Jewett testified that Towns had sometimes been violent with Masi, and in fact had injured her only a few days before her death—she had a black eye that was still discolored as of March 31. Towns consented to a search of his cell phone and gave a DNA sample to Det. Otrando. Detective Otrando also investigated other individuals considered close to Masi, including Masi's brother, as well as the second-floor tenant at the River Avenue apartment, and Towns's girlfriend.

Masi's phone records from March 30 and 31 spanned sixteen pages, and Det. Otrando began to investigate some of the phone numbers at random, choosing to put some focus on those contacts with more communications with Masi. During the first week of April, Det. Otrando chose to lock in on (401) 442-3344, a number that revealed twenty-five text messages with Masi on March 31. When he ran it through the police department's system, Det. Otrando found that it was Tejeda's phone number. Detective Otrando initially called the number, unsuccessfully attempting to get defendant to visit the police station. Then, Det. Otrando learned that defendant was going to be arrested on a federal supervised release violation[3] on April 28, 2015. In furtherance of the investigation, search warrants were obtained for a buccal swab of defendant, for the cell phone records of the (401) 442-3344 number, and for a search of defendant's residence.

## C

### Suppression Hearings

Before trial, defendant moved to suppress evidence of his cell phone, including its records, and the items that had been retrieved from defendant's apartment—bags, zip ties, and a BB gun. The defendant also moved to suppress his statements he had made to Det. Otrando

---

[3] The defendant had been previously convicted of bank robbery and fraud and was on probation for those charges.

while he was in the hospital. The trial justice denied the majority of defendant's motions, but he did grant the motion to suppress defendant's statements made while he was under arrest in the hospital after defendant said, "I don't want to make a statement."

At the pretrial suppression hearings, the federal marshals and officers responsible for arresting defendant on April 28 testified. First, federal Deputy Justin Carvalho, who had been in charge of the arrest-warrant execution on April 28 at defendant's home at 17 Van Buren Street, Providence, testified. A number of U.S. marshals, Rhode Island State Police officers, and Providence Police officers joined the arrest team. At the time of the arrest, Deputy Carvalho testified that he knew defendant was also wanted for questioning of a homicide in Providence. When the team arrived at defendant's apartment, his mother answered the door, and she agreed to let them inside, pointing them towards defendant's bedroom. The defendant's two bedroom doors were locked and he had barricaded himself in the room. Deputy Carvalho recalled standing at one bedroom door with federal Deputy Elden DaSilva, and he remembered four team members at the other door: Rhode Island State Police Det. Sean McGehearty, and federal Deputies Justin Engen, Brenton Moore, and Joseph Murphy.

When the officers broke into the bedroom, one deputy tased defendant and another officer handcuffed him. The defendant was wearing only boxer shorts, and Deputy Carvalho could not remember if another officer gave defendant clothes before they escorted him outside. Once defendant was secured in a police vehicle with Det. Christopher Poncia—a Providence police officer on the Rhode Island State Police Violent Fugitive Task Force—Deputy Carvalho stated that he followed the vehicle in his own car to the hospital, later determined to be Roger Williams Hospital (RWH). However, on cross-examination, Deputy Carvalho admitted that both his draft and final arrest reports reflected that he, Deputy Moore, and Deputy Engen transported

defendant to the hospital. Finally, Deputy Carvalho did not remember seeing any of the evidence that was allegedly seized by Det. Poncia—a cell phone, defendant's I.D. card, and a BB gun. Deputy Carvalho also testified that Det. Poncia never informed him that he seized a cell phone.

Next, Det. Poncia testified. The day of defendant's arrest, Det. Poncia was tasked with performing perimeter security outside defendant's apartment, entering the apartment after defendant was apprehended. Once inside the apartment, Det. Poncia testified, he entered defendant's bedroom and seized a firearm that was on the floor near the mattress.

When defendant was taken outside the house, Det. Poncia recalled, he was wearing pants and a shirt. Subsequently, Det. Poncia said that he searched defendant for safety reasons, and he found a cell phone and an I.D. card in defendant's right front pants pocket. On cross-examination, Det. Poncia explained that he took the cell phone from defendant in response to Det. Otrando's request to seize any cellular devices he found during the arrest.[4]

After searching defendant, Det. Poncia recalled driving him to RWH at defendant's request because of a complaint of taser injuries. Once he delivered defendant to the destination, Det. Poncia alerted Det. Otrando as to defendant's whereabouts. Detective Poncia eventually brought the cell phone to the Providence Police property room to secure it. He filled out an incident report for the items seized that day.

---

[4] Detective Otrando also testified that he had told Det. Poncia to get any cell phones he saw during the April 28 arrest. Additionally, at the pretrial hearings, notes on Deputy Carvalho's file for the Tejeda arrest were introduced. Handwritten notes were written on the cover of the file: "Chris, seize phones and zip ties." Also, Det. Otrando's name and number were written on the file. Further, the following remarks were written in Deputy Carvalho's handwriting: "3/31/15, unaccountable entire day. Old number assoc with victim. Shut it off day after murder." Deputy Carvalho testified that he did not recall where he received that information, but he said it would have been written on or before he executed defendant's arrest warrant.

Once defendant was at the hospital, Det. Otrando paid him a visit. After reading him his rights, Det. Otrando had a short conversation with him, during which defendant told him his various phone numbers, one of which was (401) 442-3344. The defendant said, "I don't want to make a statement," but Det. Otrando continued to ask him questions. Prior to that however, defendant told Det. Otrando that he was at Rhode Island Hospital (RIH) all day on March 31.

A number of other arresting federal marshals also testified at the suppression hearings. Deputies Moore, Murphy, and DaSilva each testified that they never saw a cell phone when they arrested defendant on April 28. Deputies Murphy and DaSilva also did not know who had given clothes to defendant. While Deputy Engen could not remember who had done so, he did testify that officers typically found clothes for defendants before arresting them. Deputy Engen stated that he did not search for or seize any evidence while he was in defendant's bedroom, but he did recall defendant being tased by Deputy Moore after refusing to show officers his hands. Deputy Engen handcuffed defendant, and he remembered that Det. Poncia was the officer who transported defendant to the hospital.

At the pretrial hearings, defendant also took the stand, and he explained that he locked himself in his bedroom to swallow some Vicodin pills before the police officers broke the door down. The defendant identified Deputy Carvalho as the marshal who brought him clothes and drove him to the hospital. Detective Poncia, defendant remembered, was at the hospital as well. The defendant testified that he told Deputy Carvalho, Deputy Engen, and the doctor and nurses at RWH that he had taken Vicodin that day.[5]

---

[5] When Det. Poncia was cross-examined, he stated that he had told Det. Otrando that defendant had ingested Vicodin pills before he was arrested. However, Det. Otrando testified that defendant was alert when he spoke with him at the hospital on April 28.

- 7 -

The defendant also recalled that his Huawei cell phone was in his "blue, black, yellow, and gray North Face backpack" on April 28. That particular phone had been disconnected, and defendant used it only to connect to the Internet. He remembered the backpack was next to his bed on the day of the arrest. The defendant also testified that he did not have any firearms in plain view in his bedroom that day.

## D

### Defendant's Statements

After defendant was released from the hospital, he was housed at the Donald Wyatt Detention Center (Wyatt) in Central Falls. He requested another opportunity to speak to Det. Otrando. On April 30, Det. Otrando interviewed defendant, along with Det. Steve Sullivan at Wyatt. During that interview, defendant implicated one Ramon Rodriguez in the murder of Masi. The defendant told some stories about loaning his phone to Rodriguez, editing the time frame of that alleged loan once Det. Otrando told him the contacts between defendant's phone and Masi's were between 2:28 p.m. and 3 p.m. Throughout the interview, defendant asserted that he had not spoken to Masi nor had he seen her at any point on March 31.

The defendant indicated he would speak further if a particular prosecutor was present, so the detectives returned the following day with that prosecutor. The defendant then admitted he had contacted Masi:

> "She told me to come by. I go by. She opens the door, has a black eye. Chick has a black eye. 'Oh, I ain't feeling this.' And I leave. Know [what] I mean? I hear about it the next day. You know?
> " * * *
> "All of a sudden, inside of me, I'm like, 'Yo, not only was I there,' you know what I mean? Like, I went to see her, who knows.
> " * * *
> "[B]ut * * * how's it gonna look to probation? You know what I mean?"

The defendant told a few different versions as to who had supposedly killed Masi, including one of his former co-workers at Chipotle Restaurant, but the detectives challenged his inconsistent stories. He never made a final admission of who killed her.

While defendant was at Wyatt, he made a number of phone calls to his girlfriend, Shakira Caraballo.[6] The first recording was on April 28, 2015 at 8:40 p.m.:

> "Mr. Tejeda: * * * I need her to go to my mom's house like emergency, a 911, I can't tell you over the phone right now because it's, like, it's important, but I need her to go to my mom's house.'
>
> "Ms. Caraballo * * *: 'It's, it's, is it really bad?'
>
> "Mr. Tejeda: 'Yeah, it's – it's very, very bad, I need her to go to my mom's house, she knows why she has to go, but I need her to go to my mom's house.'"

The defendant proceeded to ask Caraballo to text his child's mother and tell her to go to his mother's house and pick up his "blue North Face" and his "big [M]arine bag" as soon as possible. Then, defendant said:

> "TEJEDA: * * * [T]here's something that's going on that you don't know about, and I can't tell you over the phone, my love. All right? There's a reason as to why they went to my house and looked for the SIM card. Okay?
> " * * *
> "TEJEDA: You tell her, she has to get my North Face bag and she has to get that bag, emergency, immediately, that I said so. Tell her that my probation officer went to the house and looked for the chip from my cell phone. But she needs to get my North Face."

On April 30 at 11:38 a.m., defendant had a phone conversation with an unknown female. The woman told defendant that she had not been able to get his "backpacks" from his mother's house as asked, and when he grew concerned, she replied, "Yeah, but the sack, the sack, the big sack was intact, they didn't open it or anything." The woman clarified that she did end up taking

---

[6] Detective Otrando had the calls translated from Spanish to English and transcribed.

one bag, but it had been emptied out and she did not see any old phones in the bag. The defendant responded: "[L]isten to me, this is really important, really important, I need you to get my INAUDIBLE off my mom, period * * *. The people from yesterday they went and they talked to me in the, in the hospital * * * and they looked for my SIM card * * *." About twenty minutes later, defendant spoke to the same woman again: "[Y]ou need to go to my mom's yesterday. I don't have to tell you what you have to do; you already know what you have to do. I've been telling you for three f**king days what you have to do."

## E

### Defendant's Contact with Victim

At the pretrial hearings, Det. Theodore Michael, who assisted Det. Otrando with the investigation's mobile forensics, testified as to the contents of the text-message exchanges between Masi and defendant on the afternoon of Masi's death. On March 31, there was a text from defendant's phone to Masi at 2:56 p.m. stating, "You said 216 River Ave right?" followed by "Do you have a car if I want you to come here?" Two texts from Masi's number both state "yes." After an exchange regarding the prices and services, defendant texted Masi at 3:03 p.m., "Okay. OMW [on my way] now then," to which Masi responded, "Ok." Then, at 3:18 p.m., defendant texted Masi, "I'll be there in less than 10 min[utes]." At 3:22 p.m., he wrote: "Is it cool if I just take a look around before I give you the flowers to make sure we're alone? I've had a bad experience * * * [b4] * * * LOL," followed by "No offense." At 3:22 p.m., Masi texted back, "okay," and "TY."[7] At 3:27 p.m., defendant texted, "I'm outside." At 3:28 p.m., Masi texted, "K. Come to back door." Then, she said, "Third floor," followed by, "Doors open." The last text was from defendant at 3:28 p.m., stating, "It's * * * lockes [*sic*]."

---

[7] "Thank you."

Additionally, at the suppression hearings, the trial justice heard testimony from Det. Koren Garcia, who assisted Det. Otrando in searching defendant's residence pursuant to the May 6 search warrant after the April 28 arrest. During the search, Det. Garcia testified that she found a "military camouflage duffel bag" in the bedroom that contained two packages of zip ties—one black and one opened package of white zip ties. Detective Otrando also testified regarding the search, attesting that the white zip ties were the same size and color of the zip tie found around Masi's neck. He explained that although the opened package Det. Garcia located had space for five zip ties, only four remained. Further, Det. Otrando recalled that he found two cell phones on a bureau in defendant's bedroom. He also stated that there was no North Face backpack found in the bedroom during that search.

## F

### The Trial

At trial, Rhode Island's Chief Medical Examiner, Dr. Christina Stanley, testified that the zip tie around Masi's neck had left a ligature mark[8] and abrasions. Doctor Stanley opined that the two abrasions on Masi's neck indicated that she had not committed suicide. On cross-examination, Dr. Stanley ruled out use of zip ties in sexual play because zip ties have no safety mechanism for removal. The autopsy report noted cause of death as homicidal asphyxia, with the manner of death being homicide.

Tamara Wong, a senior forensic scientist at the Rhode Department of Health, also testified at trial regarding the DNA tests she ran on the zip tie found around Masi's neck. She received a buccal swab[9] with defendant's DNA, which she used for comparison

---

[8] A ligature mark is "a mark left by something long that can be tightened."
[9] A buccal swab is used to obtain a sample of an individual's inner cheek lining.

purposes.[10] When Wong performed a DNA analysis on the zip tie, she found that results were consistent with Masi as the major contributor and defendant as the minor contributor. Wong testified that, statistically, her conclusion that the mixed DNA profile on the zip tie was from Masi and defendant was 1,705,000 times more likely than that if the profile was from Masi and any other individual. Wong also found that the DNA at the corner of the white zip tie plastic packaging was consistent with defendant. On cross-examination, Wong did acknowledge the possibility that testing could be affected by various forms of contamination.

At the close of trial, the jury convicted defendant of first-degree murder. The defendant moved for a new trial, which the trial justice denied, and defendant was sentenced to a life sentence plus a consecutive twenty-five-year non-parolable sentence as a habitual offender. The defendant timely appealed his conviction to this Court.

## II

### Issues on Appeal

On appeal, defendant argues that his trial commenced after the 180 days required by the IAD. Additionally, defendant contends that the trial justice erred in denying his motions to suppress (1) the alleged illegal seizure of his cell phone at the time of his arrest; (2) the telephone records and other items—including zip ties—garnered from two allegedly invalid search warrants; and (3) an allegedly illegally obtained statement from defendant while he was in the hospital after his arrest. Also, defendant argues that the sentence imposed upon him was unduly harsh and unwarranted.

---

[10] Detective Otrando obtained a search warrant to take a buccal swab from defendant while he was at Wyatt. The defendant does not contest that search warrant on appeal.

# III

## Discussion

### A

### Interstate Agreement on Detainers

#### 1

#### Standard of Review

When we review a trial justice's denial of a defendant's motion to dismiss under the IAD, we apply a *de novo* standard. *State v. Werner*, 831 A.2d 183, 191 (R.I. 2003). We give deference to "the findings of historical fact upon which the trial justice's legal determination is based," and the findings "will be disturbed only if clearly wrong." *Id.*

#### 2

#### Analysis

The IAD provides that

> "whenever during the continuance of [a person's] term of imprisonment there is pending in any other party state any untried indictment * * * on the basis of which a detainer has been lodged against the prisoner, he or she shall be brought to trial within one hundred eighty (180) days after he or she shall have caused to be delivered to the prosecuting officer and the appropriate court * * * written notice of the place of his or her imprisonment and his or her request for a final disposition to be made of the indictment * * * provided, that, for good cause shown in open court, the prisoner or his or her counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance." Section 13-13-2, Art. III(a).

If a trial is not commenced within the statutorily prescribed 180 days, "such [an] indictment * * * shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice." *Id.* at Art. IV(e).

The defendant was a federal prisoner when he was returned per his request under the IAD to Rhode Island on October 5, 2015 to answer the first-degree murder charge in this case. As of Friday, April 1, 2016, he had been in custody for 180 days, and the jury selection was set to start on Monday, April 4, 2016. The defendant moved to dismiss the charges based on an alleged violation of the IAD. However, defendant had finished serving his federal sentence on February 25, 2016. During the week leading up to April 1, 2016, the court entertained a number of pretrial motions filed by defendant, but the trial justice stated that he was ready to empanel a jury that day, April 1, if "there were jurors in the courthouse." In denying defendant's motion to dismiss, the trial justice noted that defendant had previously been advised that he was a state detainee as of February 25, 2016 because his federal term of imprisonment was complete.

The defendant's rights under the IAD existed only so long as he was serving on federal charges. *See United States v. Saffeels*, 982 F.2d 1199, 1204 (8th Cir. 1992), *vacated on other grounds*, 510 U.S. 801 (1993) (commenting that the expiration of a defendant's sentence before the 180 days meant that the IAD no longer applied to him and resulted in his reversion to the status of being simply a "pretrial detainee"); *see also United States v. Roy*, 830 F.2d 628, 633 (7th Cir. 1987) (noting that, once a defendant's state sentence expired, the IAD no longer applied with respect to the trial deadline for his federal charges). Consequently, defendant's federal sentence's expiration in February 2016 nullified any rights he had under the IAD. *See Saffeels*, 982 F.2d at 1204.

Even assuming that the IAD still applied to defendant after the expiration of his federal sentence, the charges against defendant should not have been dismissed because the delay in bringing the case to trial within 180 days was a result of defendant's own pretrial motions. *Cf. State v. Moosey*, 504 A.2d 1001, 1003-04 (R.I. 1986) (holding that the failure to try a defendant's

case outside the statutory time period does not warrant dismissal of the case where the delays in taking the case to trial were a result of the defendant's choice to change counsel).  As it is clear from the record that the state was prepared to proceed within the 180-day timeframe, here the delay in trying defendant's case was a result of defendant's motions to suppress.

As such, we affirm the trial justice's denial of defendant's motion to dismiss the charges for an alleged IAD violation.

## B

## Evidentiary Rulings

## 1

## Motion to Suppress—Huawei Cell Phone

## a

## Standard of Review

When this Court reviews a motion to suppress, we "will not overturn a trial justice's factual findings unless they are clearly erroneous."  *State v. Harrison*, 66 A.3d 432, 441 (R.I. 2013).  With respect to any purported violations of a defendant's constitutional rights, "this Court must make an independent examination of the record to determine if [the defendant's] rights have been violated."  *Id.* (quoting *State v. Goulet*, 21 A.3d 302, 311 (R.I. 2011)).  In conducting the independent examination, "we view the evidence in the record in the light most favorable to the state."  *State v. Santos*, 64 A.3d 314, 319 (R.I. 2013) (quoting *Goulet*, 21 A.3d at 311).  Additionally, we "review a trial justice's determination of the existence or nonexistence of probable cause or reasonable suspicion on a *de novo* basis."  *Id.* (quoting *Goulet*, 21 A.3d at 311).

**b**

**Analysis**

The defendant moved to suppress the cell phone that was seized from his person when he was arrested on April 28, which the trial justice denied. The Fourth Amendment to the United States Constitution "protects the right to be free from 'unreasonable searches and seizures.'" *Davis v. United States*, 564 U.S. 229, 230-31 (2011). Nevertheless, a warrantless search incident to arrest is permissible if it is of "the arrestee's person [or] the area 'within his immediate control,' * * * mean[ing] the area from within which he might gain possession of a weapon or destructible evidence." *Arizona v. Gant*, 556 U.S. 332, 339 (2009) (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)); *see also Carillo v. Moran*, 463 A.2d 178, 180 n. 1 (R.I. 1983) (citing *Chimel*, 395 U.S. at 762-63).

In denying defendant's motion to suppress the seizure of the cell phone, the trial justice made several credibility determinations. The trial justice believed Det. Poncia's testimony that he checked defendant's pockets as a safety precaution before putting him in his vehicle. He was not troubled by the fact that no officers saw any cell phones in defendant's bedroom, indicating their memories may have been clouded by the arrest, which was a "hectic and chaotic event." Further, the trial justice found it difficult to accept defendant's testimony that his phone was actually located in his North Face backpack at the time of the arrest. The defendant testified that he told Caraballo to tell Brenda Rivera, his child's mother, to go get his bag that contained his phone because he was worried about any incriminating information that could implicate him in family court matters with Rivera. The trial justice doubted this explanation, reasoning that defendant's request for Rivera to go get the phone made little sense if he was really concerned about legal issues he had with Rivera herself. Furthermore, the trial justice wondered why

- 16 -

defendant would have requested removal of both the North Face bag and a Marine duffel bag—where the zip ties were found—if he was concerned only about the phone. The trial justice also took issue with defendant's credibility based on his federal fraud convictions and numerous lies to police during the Wyatt discussions. *See State v. Hall*, 940 A.2d 645, 657 (R.I. 2008) (noting that a defendant's attempts to shift blame to other individuals indicate that the defendant was "calculating and cunning and understood the gravity of his position" (quoting *State v. Monteiro*, 924 A.2d 784, 791 (R.I. 2007))). The trial justice found that Det. Poncia did not look through the bags to find a cell phone, reasoning that, if he had, he would have found the zip ties or at least taken the cell phone that was on the bureau.[11]

The defendant asks this Court to find that Det. Poncia's testimony is contrary to the other officers in attendance at defendant's April 28 arrest and cannot reasonably be believed. However, while we do conduct an "independent examination" of the record to decide whether defendant's constitutional rights were violated, we still defer to the trial justice's findings of fact unless there is clear error. *Harrison*, 66 A.3d at 441 (quoting *Goulet*, 21 A.3d at 311). In this case, we do not believe there is clear error. Inconsistencies existed among officers' post-arrest reports and trial testimony, but we do not believe that the trial justice clearly erred in his credibility determinations. Detective Poncia's testimony at the pretrial hearings that he transported defendant to the hospital was corroborated by Deputy Carvalho and Deputy Engen. Notwithstanding that Deputy Carvalho's testimony did contradict his initial police report, the trial justice found that Det. Poncia's testimony was still credible in light of the disorder during the tasing and arrest of defendant, lending credence to the other officers' claims that they never

---

[11] We recognize that the trial justice referred to a single cell phone found on the bureau at defendant's apartment, while Det. Otrando testified that he found two cell phones on the bureau during the search. However, the discrepancy does not affect our analysis.

saw any cell phones. We agree. The only contradictory testimony was by defendant, whom the trial justice found not credible in light of his admission that he lied to police officers, as well as his former federal conviction for fraud. We are satisfied with the trial justice's admission of evidence on these grounds.

**2**

**Motions to Suppress—May 4 & May 6 Search Warrants**

**a**

**Standard of Review**

"The Fourth Amendment to the United States Constitution and article 1, section 6, of the Rhode Island Constitution, prohibit the issuance of a search warrant absent a showing of probable cause." *State v. Byrne*, 972 A.2d 633, 637 (R.I. 2009) (quoting *State v. Verrecchia*, 880 A.2d 89, 94 (R.I. 2005)). The "four corners of the affidavit prepared in support of the warrant" should demonstrate probable cause, which the issuing magistrate will decide. *Id.* at 638.

When this Court reviews the issuance of a warrant, we "accord great deference to the issuing magistrate's probable-cause determination, so long as there is a showing of a substantial basis from which to discern probable cause."[12] *State v. Storey*, 8 A.3d 454, 460 (R.I. 2010)

---

[12] We have further explained that this standard of review is not conducted *de novo*. *State v. Byrne*, 972 A.2d 633, 638 (R.I. 2009). Instead,

> "[a]lthough 'the ultimate questions of reasonable suspicion and probable cause to make a warrantless search should be reviewed *de novo*,' * * * a deferential standard of review should be applied when reviewing a magistrate's decision to issue a warrant because '[t]he Fourth Amendment demonstrates a strong preference for searches conducted pursuant to a warrant, * * * and the police are more likely to use the warrant process if the scrutiny applied to a magistrate's probable-cause determination to issue a warrant is less than that for warrantless searches.'" *Id.* (quoting *State v. King*, 693 A.2d 658, 661 (R.I. 1997)).

- 18 -

(quoting *Byrne*, 972 A.2d at 638). Ideally, police officers should secure warrants prior to a search, and so "an affidavit offered in support of a search warrant should not be judged as if it had been drafted by one schooled in the niceties of the law nor should it be interpreted in a hypertechnical manner." *Verrecchia*, 880 A.2d at 94 (quoting *State v. Nerney*, 110 R.I. 364, 365, 292 A.2d 882, 883 (1972)); *see also Byrne*, 972 A.2d at 638. That is, "the approach to the probable cause question should be pragmatic and flexible." *Id.* "The magistrate need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit." *Byrne*, 972 A.2d at 639 (quoting *United States v. Peacock*, 761 F.2d 1313, 1315 (9th Cir. 1985), *overruling on other grounds recognized by United States v. Fernandez*, 388 F.3d 1199, 1254 (9th Cir. 2004)). We emphasize that "the resolution of doubtful or marginal [probable-cause] cases * * * [is] largely determined by the preference to be accorded to warrants." *Storey*, 8 A.3d at 461 (quoting *Byrne*, 972 A.2d at 639).

Moreover, we "should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Byrne*, 972 A.2d at 639 (quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996)). We review a trial justice's decision of whether probable cause existed *de novo*. *Id.* at 638.

Additionally, we review the trial justice's ruling on a defendant's request for a *Franks* hearing "with deference." *State v. Patino*, 93 A.3d 40, 51 (R.I. 2014).

**b**

**Analysis**

i. *May 4 Search Warrant*

On appeal, defendant argues that the affidavit supporting the May 4 search warrant for defendant's cell phone records contained a deliberate material omission, indicating that the trial justice erred in his determination at the *Franks* hearing below.[13]

In *Franks v. Delaware*, 438 U.S. 154 (1978), the United States Supreme Court prescribed a method to challenge search warrants that relied on affidavits that contained "false statement[s] made knowingly and intentionally, or with reckless disregard for the truth." *Patino*, 93 A.3d at 59 (quoting *Franks*, 438 U.S. at 155-56). A defendant may have a right to an evidentiary hearing, but only if he or she can satisfy two showings: (1) a "substantial preliminary showing that a false statement [was made] knowingly and intentionally, or with reckless disregard for the truth * * *"; and (2) a showing "that the allegedly false statement is necessary to the finding of probable cause." *Id.* (citing *Franks*, 438 U.S. at 156). If the statements under attack are found to be sufficiently false and are set aside, but "there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *State v. DeMagistris*, 714 A.2d 567, 574 (R.I. 1998) (quoting *Franks*, 438 U.S. at 171-72).

---

[13] During the pretrial hearings, the trial justice referred to defendant's motions to suppress as "semi-*Franks*" motions, and decided them as such:

> "I've given you this opportunity because the State hasn't vigorously objected to having done it. So we've done it. But if the things that you complain about nonetheless leave an affidavit that supports probable cause, the motion cannot be successful and cannot prevail."

Therefore, we will review the trial justice's determination accordingly.

The defendant argues that the affidavit written by Det. Michael did not pass muster due to Det. Michael's failure to include the fact that, between the time of Masi's Backpage posting and the time she sent her last text message at 3:32 p.m., there were over 300 texts and calls between Masi and other phone numbers in addition to the contacts with defendant's phone number. Detective Michael's affidavit provided that Masi was found unresponsive at her River Avenue apartment on March 31, 2015 at 5:37 p.m. Detective Michael described Det. Otrando and Det. Sullivan's investigation into the persons and contacts in Masi's life, which encompassed a search into Masi's phone records. Detective Michael also included that there were thirteen text messages "sent/received from a cellular number of 401-442-3344 between 2:56 pm and 3:28 pm, and one 78 second call incoming" from the same number at 2:51 p.m. The affidavit stated that Det. Otrando determined that defendant was associated with that (401) 442-3344 phone number, and that Det. Otrando contacted defendant for a statement. Further, Det. Michael wrote that "[i]nterview statements were scheduled on two occasions with Tejada [*sic*], where he failed to show on both occasions."

Detective Michael also included the following description of the seizure of defendant's phone on April 28: "At the time [of defendant's arrest], a HAUWEI [*sic*] CELLULAR PHONE * * * was in the apartment, and Tejada [*sic*] stated that the phone was his, and that the phone number is that of 401-442-3344. The Cellular phone was seized, placed in property, where it was then turned over to this affiant on May 1, 2015." Detective Michael also referenced defendant's statement to officers during the interview at Wyatt in which he told officers that he was not at Masi's residence on that day, but rather with his friend Ramon at a gas station "less than two blocks from the homicide."

The trial justice denied the motion to suppress the May 4 warrant, finding that Det. Michael's omission in the affidavit of the other phone numbers used to contact Masi on the day of her death was not material. He found that the addition of other calls and texts would have only increased the amount of possible suspects, and would not have affected the probable cause to seize the phone records of defendant.

There was also some inaccurate information in the affidavit—that defendant "failed to show on [two] occasions," but Det. Otrando's testimony made it clear that he had called defendant a few times without actually meeting with him before his arrest. Also, the affidavit incorrectly stated that defendant was interviewed at Wyatt "in the presence of counsel." The trial justice found that Det. Michael had made neither error intentionally. Further, the trial justice found, even omitting "failed to show on both occasions" and "in the presence of counsel" from the affidavit, the document still contained enough information to support accessing cell phone records.

It is clear to this Court that defendant failed to make the requisite showings under *Franks* to counter the trial justice's denial of his motion to suppress the cell phone records. Based on Det. Michael's testimony at the pretrial hearings, the trial justice determined that Det. Michael's decision to omit all the other cell phone numbers could not satisfy defendant's showing on the second prong of the *Franks* test. *See Patino*, 93 A.3d at 59 (citing *Franks*, 438 U.S. at 155-56). Although Det. Michael's decision to reference only defendant's communications with Masi in the affidavit was certainly intentional, his choice to exclude other individuals who also communicated with Masi on March 31 does not take away from the probable cause evident in the May 4 affidavit—that, taking the affidavit as a whole, there was probable cause to search defendant's cell phone. *See Storey*, 8 A.3d at 462 (While "each piece of information may not

alone be sufficient to establish probable cause and some of the information may have an innocent explanation, 'probable cause is the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observed as trained officers'" (quoting *State v. Schmalz*, 744 N.W.2d 734, 738 (N.D. 2008))).

ii.    *May 6 Search Warrant*

The May 6 search warrant issued to search defendant's apartment, and the affidavit that supported the warrant was drafted by Det. Otrando.  Detective Otrando stated that defendant had been arrested on April 28 for an unrelated charge, and "a replica firearm and cell phone was seized from Daniel Tejada [*sic*]."  Detective Otrando described the various conversations he had with defendant at the hospital on April 28 and at Wyatt on April 29 and 30, in which defendant offered different versions of his location on March 31.  Detective Otrando also referenced the cell phone records accessed after the May 4 warrant was issued, which placed defendant at 216 River Avenue "and speaking with the victim.  In one text the victim Ashely [*sic*] Masi invites Daniel Tejeda inside the residence and to the 3rd floor."  Additionally, Det. Otrando specified, "Tejada [*sic*] * * * called the victim 7 times between the hours of 1458 and 1538 hrs."  Detective Otrando also wrote that Tejeda's DNA "matched the DNA profile located on the murder weapon (ZIP TIE)."

The defendant contends that there were also material omissions and deliberate falsehoods in the May 6 affidavit.  In another "semi-*Franks*" hearing, the trial justice heard testimony from Det. Garcia, who testified that, as part of the search, she found the Marine duffel bag in defendant's apartment containing the two packages of zip ties.  Detective Otrando testified that the white zip ties were the same size and color of the zip tie found around Masi's neck, and the

package Det. Garcia located initially contained five zip ties, but was missing one. He also testified that there was no North Face backpack in the bedroom found during that search.

The trial justice denied defendant's motion to suppress the evidence seized pursuant to the May 6 warrant. The affidavit supporting the warrant stated that defendant called Masi seven times. The statement was inaccurate because defendant and Masi had actually exchanged a total of twenty-five text messages on March 31 and only one phone call. The trial justice found that this was not a material misstatement and, if anything, the error actually favored defendant in that it made it appear that he had had less contact with Masi. When defendant spoke with officers while he was at Wyatt, he mentioned Masi's black eye as the reason why he left her apartment when he arrived there to engage her services. The trial justice ruled that, even omitting the paragraph referring to defendant's mention of Masi's black eye, the affidavit was still valid because it included the information about defendant's contact with Masi on that day via text messages, which indicated that defendant had arrived at her house on March 31. Further, the trial justice held that the affidavit's reference to a "DNA match" may not have been totally accurate, but it was not a falsehood. Additionally, the trial justice ruled that the mention of a BB gun or firearm was irrelevant in a case where cause of death was homicidal asphyxia.

We agree with the trial justice and hold that defendant failed to make the necessary showings under *Franks* to challenge the trial justice's admission of the evidence obtained via the May 6 warrant. Again, defendant failed to satisfy the second prong of *Franks* because, even removing the purported falsehoods of Det. Otrando, there was still reason to find probable cause within the "four corners of the affidavit." *Byrne*, 972 A.2d at 638. In fact, the alleged misstatements appear to bolster defendant's case because they indicate that he had less contact with Masi than he actually did, albeit via text messages instead of phone calls, and the firearm

- 24 -

had no relevance to Masi's cause of death. *See Patino*, 93 A.3d at 55 (acknowledging that courts have found a similarity "between text messages and other forms of communication").

Therefore, the trial justice did not clearly err in denying defendant's motion to suppress the evidence seized pursuant to the May 6 warrant as the affidavit, even excluding the purported falsehoods, demonstrated probable cause to search defendant's apartment.

**3**

**Motion to Suppress—Defendant's Statements at the Hospital**

**a**

**Standard of Review**

When a defendant moves to suppress a confession, "the trial justice should admit a confession or a statement against a defendant only if the state can first prove by clear and convincing evidence that the defendant knowingly, intelligently, and voluntarily waived his [or her] constitutional rights expressed in *Miranda v. Arizona*." *State v. Musterd*, 56 A.3d 931, 937-38 (R.I. 2012) (quoting *State v. Barros*, 24 A.3d 1158, 1179 (R.I. 2011)). Upon review of a trial justice's ruling, we "defer to the trial justice's findings of historical fact concerning the voluntariness of the confession unless those findings are clearly erroneous." *Id.* at 938. Additionally, we "apply those historical facts and review *de novo* the trial justice's determination of the voluntariness of the statement." *Barros*, 24 A.3d at 1179 (quoting *State v. Bido*, 941 A.2d 822, 836 (R.I. 2008)).

A statement is voluntary if it "is a product of free will and rational choice, whereas a statement is deemed involuntary when the defendant's will was overcome by coercion, threats, violence, or undue influence." *State v. Bojang*, 83 A.3d 526, 533 (R.I. 2014) (quoting *Monteiro*, 924 A.2d at 790). As part of our *de novo* review of whether a confession was voluntary, we

- 25 -

"consider the totality of the circumstances." *Id.* We also look at whether a defendant made the statement "knowingly and intelligently[—]that is, 'with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Musterd*, 56 A.3d at 938 (quoting *State v. Jimenez*, 33 A.3d 724, 734 (R.I. 2011)).

**b**

**Analysis**

The defendant contends that Det. Otrando's trial testimony mischaracterized defendant's RWH statements with respect to the time defendant said he was at RIH on March 31. The state counters that defendant waived that argument because he did not object to Det. Otrando's trial testimony.

In the pretrial hearings, defendant sought to suppress the discussions that he had with Det. Otrando while hospitalized at RWH after his federal arrest. Once defendant was at the hospital, Det. Otrando visited him and read him his rights before conversing with him, eventually learning that one of defendant's phone numbers was (401) 442-3344.[14] Detective Otrando recalled that defendant also told him he stayed "all day" at RIH on March 31.[15] The defendant expressed that he did not want to make a statement, but Det. Otrando continued asking questions. The trial justice suppressed everything after defendant's indication that he did not want to talk. The trial justice ruled as follows:

> "With respect to the hospital statement, everything after the defendant's comment, 'I don't want to make a statement' is suppressed. That short conversation before that statement in which the defendant recited some telephone numbers and his stay at the emergency room, as recorded at least in his notes and in his memory by Otrando, that is permissible and acceptable and

---

[14] This conversation occurred before Det. Otrando began recording the discussion.
[15] Detective Otrando's notes written on the back of the rights waiver form stated: "3-31 @ RI ER all day (check cameras)."

admissible. Everything after the statement when he says, 'I don't want to make a statement,' that's out. All of it. Everything else is in."

After the trial justice ruled, the prosecutor clarified: "The statement that this defendant made was that he was at the hospital emergency room from nine to five on 3/31. That portion of the statement is in." The trial justice agreed, but defense counsel objected to the entirety of the statement, contending that defendant did not tell Det. Otrando about his presence at RIH on March 31 until *after* he voiced his desire to remain silent. After confirming with Det. Otrando that he had testified that defendant told him about the RIH visit prior to invoking his privilege, the trial justice ruled that the statement was admissible.

Later, at trial, Det. Otrando testified that he asked defendant where he was on March 31, "and he had told me that he was at Rhode Island Hospital from the morning until approximately 5:00 o'clock, I believe." At trial, defense counsel made no objection to this portion of Det. Otrando's testimony. On appeal, defendant contends that Det. Otrando's reference to 5 p.m. with respect to defendant's RIH visit was inaccurate because Det. Otrando's notes did not specify a time.

"We repeatedly have expressed our view that a failure to object 'in the vital context of the trial itself (except where the *in limine* ruling was unequivocally definitive) [constitutes] a waiver of the evidentiary objection and [is] therefore an issue that may not be raised on appeal.'" *State v. Andujar*, 899 A.2d 1209, 1222 (R.I. 2006) (quoting *State v. Kaner*, 876 A.2d 1133, 1134 n. 4 (R.I. 2005) (mem.)). At the suppression hearings, the trial justice made a definitive ruling, indicating that anything defendant said after invoking his right to remain silent was inadmissible, but the statements before defendant's invocation as memorialized in Det. Otrando's notes or memory were admissible. Defense counsel objected to the admissibility of defendant's entire

statement, arguing that it was inadmissible because of its timing, that is, defendant said it *after* he stated he wished to remain silent. It is only on appeal that defendant now argues that the content of Det. Otrando's trial testimony was inaccurate with respect to whether defendant said he was at RIH "all day" or until "5 p.m." Given that the trial justice's ruling was definitive only with respect to the timing of defendant's statement, not the content of it, we cannot say that the *in limine* ruling was "unequivocally definitive" with respect to defendant's argument on appeal such that defendant's objection at the pretrial hearings was sufficient to preserve his argument on appeal. *See id*. at 1222 (quoting *Kaner*, 876 A.2d at 1134 n. 4). Accordingly, defendant's argument regarding his RWH statement is waived.

## C

### Habitual Offender Sentence

#### 1

#### Standard of Review

We review issues of statutory interpretation *de novo*. *State v. Burke*, 811 A.2d 1158, 1167 (R.I. 2002). "It is well settled that when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." *Id.* (quoting *Solas v. Emergency Hiring Council of Rhode Island,* 774 A.2d 820, 824 (R.I. 2001)). When we interpret "a legislative enactment, it is incumbent upon us to determine and effectuate the Legislature's intent and to attribute to the enactment the meaning most consistent with its policies or obvious purposes." *Id.* (quoting *Oliveira v. Lombardi*, 794 A.2d 453, 457 (R.I. 2002)).

**2**

**Analysis**

The defendant contends that the twenty-five-year sentence imposed in addition to the mandatory life sentence serves no useful purpose and does not advance the intent of the habitual offender statute, G.L. 1956 § 12-19-21.

The habitual offender statute provides in relevant part as follows:

> "If any person who has been previously convicted in this or any other state of two (2) or more felony offenses arising from separate and distinct incidents and sentenced on two (2) or more occasions to serve a term in prison is, after the convictions and sentences, convicted in this state of any offense punished by imprisonment for more than one year, that person shall be deemed a 'habitual criminal.' Upon conviction, the person deemed a habitual criminal shall be punished by imprisonment in the adult correctional institutions for a term not exceeding twenty-five (25) years, in addition to *any sentence* imposed for the offense of which he or she was last convicted." Section 12-19-21(a) (emphasis added).

We have referenced the policy behind this statute as a reflection of "the Legislature's determination that a third or subsequent offense is more serious than a first or second offense and accordingly should be punishable as such." *Burke*, 811 A.2d at 1167-68 (quoting *State v. Smith*, 766 A.2d 913, 924 (R.I. 2001)). Moreover, such statutes are passed "to deter and punish incorrigible offenders * * * [and] [t]hey are intended to apply to persistent violators who have not responded to the restraining influence of conviction and punishment." *Id.* at 1168 (quoting *Smith*, 766 A.2d at 924).

Here, the trial justice saw fit to impose the harshest sentence available because of his belief that defendant's actions were especially cruel. He remarked that the murder was "one of the most disturbing and inexplicably violent homicides I have seen * * * nasty and cruel to an

unimaginable degree." Further, he stated that there was "no explanation other than uncommon maliciousness and extreme indifference to the sanctity of human life."

The defendant's conviction of such a horrific crime, coupled with his previous convictions, are enough to support the trial justice's imposition of the life sentence plus twenty-five years. We have referenced before the United States Supreme Court's blessing that "a state may impose its harshest penalty upon a 'cold-blooded, pitiless slayer' who kills without feeling or sympathy." *State v. Garcia*, 743 A.2d 1038, 1057 (R.I. 2000) (quoting *Arave v. Creech*, 507 U.S. 463, 470 (1993)). We are satisfied, then, that the trial justice's sentence was in accordance with the policy of the habitual offender statute.

## IV

## Conclusion

For the foregoing reasons, the defendant's appeal is denied and dismissed, and the judgment appealed from is affirmed. The papers in the case are remanded to the Superior Court.

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Daniel Tejeda. |
| **Case Number** | No. 2016-242-C.A. (P1/15-2222A) |
| **Date Opinion Filed** | November 8, 2017 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Gilbert V. Indeglia |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State: Virginia M. McGinn Department of Attorney General<br><br>For Defendant: Susan B. Iannitelli, Esq. |